OPINION OF THE COURT
Bernard J. Fried, J.
By this CPLR article 78 petition, the New York Times Company (the Times) seeks to compel the respondents, City of New York (City) and the New York City Human Resources Administration (HRA),[1] “to release information under Section 136 (1) of the Social Services Law,” which is contained in the books and records of disbursements for public assistance. What is requested are the names and addresses of all persons who *874 are receiving or previously received public assistance, “but, whether as a consequence of the City’s ‘workfare’ program or for other reasons, no longer are.” The stated purpose of this request is to allow reporters from the Times to contact and interview a representative sample of past recipients of public assistance, in order to examine whether the “workfare” program has been successful, as claimed in public statements by City officials.
At issue is the correct interpretation of section 136 (l),[2] which provides for the confidentiality of the “names or addresses of persons applying for or receiving public assistance”. This section was amended in 1960 (L 1960, ch 1031), to provide that upon the written application of a “bona fide news disseminating firm or organization” for “inspection by an authorized representative of such firm or organization of the books and records of the disbursements made by [the HRA] for public *875 assistance and care, such requests shall be granted within five days and such [news organization] shall be considered entitled to the information contained in such books and records * * * provided [that] such * * * [news] organization shall give assurances in writing that it will not publicly disclose * * * the names and addresses of applicants for or recipients of public assistance and care”. It is conceded that the Times is a “bona fide news disseminating firm or organization.”[3]
The events which led to the filing of this petition were as follows: On May 27, 1997, Mr. David Firestone, the Times City Hall Bureau Chief, wrote to Ms. Lilliam Barrios-Paoli, Commissioner, HRA, requesting under section 136 (1), “access to the books and records reflecting disbursements made to all persons receiving public assistance (Home Relief or ADC) in New York City, including, without limitation, the recipients’ names and address.” Similar information was requested “as of April, 1995, including without limitation, the names and addresses of those recipients who have since left the rolls.” Recognizing “that this is an enormous list” (estimated at the hearing on this petition to exceed 400,000 names),[4] the Times offered to reimburse the City for costs and to “negotiate a time period beyond the [statutorily mandated] five days.” The necessary written assurances against public disclosure were provided.
Responding to the Times’ request, Gabriel W. Gorenstein, Esq., General Counsel, HRA, pointed out that the information maintained by HRA consisted of “many generic categories,” and requested that there be further specificity of what was wanted “so that we can provide you with access to the appropriate records regarding our disbursements.” However, Mr. Goren-stein wrote “fb]ecause the statute does not specifically authorize disclosure of the names and addresses of public assistance recipients, we are unable to provide them to you.”[5] It is this decision by respondents, that the Times is not statutorily entitled to the names and addresses, that is the subject of this petition.
*876 The respondents (and the State interveners) argue that section 136 (1) is designed to ensure the privacy of public assistance recipients and to protect them from the stigma of public disclosure, and that the 1960 amendment was narrowly drawn and not designed to enable a newspaper “to contact and interview such recipients.” It is also argued that “[t]he Legislature intended only to permit the examination of records of expenditures for public assistance, so as to provide the public with knowledge of irregularities in such expenditures.” The gravamen of the argument is that because the request “is unconnected with any examination of disbursements, but rather for the purpose of contacting such recipients and interviewing them with regard to their experiences in the public assistance and workfare programs,” this inspection is impermissible under section 136 (1). Respondents further contend that the amendment dated from a precomputer era when the “books and records of the disbursements” were handwritten ledgers, but that today the records are computerized. Because of this modern technology, the information could be coded to eliminate the names and addresses, but still allow the Times to inspect for financial irregularities. Such coding would permit the Times to “analyze this data [all available information regarding disbursements to current and former recipients] by means of statistical sampling techniques. The only thing [the Times] could not do would be what the Social Services Law expressly prohibits — use the public assistance rolls to identify and contact individual recipients or former recipients.” (Letter from respondents, [emphasis in original].)
At the hearing, the respondents further argued that if the Times gave the names and addresses to its own reporter, “for *877 the purpose of going out and speaking to individual public assistance recipients [that] would in and of itself be a violation [i.e., public disclosure] committed when the Times disclosed the names and addresses of that information to a reporter.” Moreover, although it was contended by the City, and conceded by the Times, that prohibited disclosure would occur when the reporter went looking for the recipient and stated to a third person the purpose of the visit, the State intervenor argued that the mere act of “going to see” a public recipient, whose name and address was obtained as a result of the inspection of the books and records, would constitute the prohibited public disclosure.
Essentially, the Times contends that section 136 (1) requires that the information sought be provided to it, and that the purpose for which it seeks this information is immaterial. However, the Times argues that if its purpose is relevant, then a letter[6] in the Bill Jacket makes it clear that an attempt to contact recipients, whose names and addresses were obtained by inspection of the books and records of disbursements, was anticipated at the time the amendment was proposed, and that it nevertheless was adopted. The Times refused to agree to the City’s coding proposal, since its very purpose is to interview the persons disclosed (or a representative sample of these individuals). Finally, the Times concedes that if in the course of seeking an individual whose name was obtained during the inspection, it disclosed to a third person that the person they were seeking “was a former recipient of public assistance, that would be public disclosure of a kind, but that’s not what we propose to do. We propose to talk only to the person who already knows his or her own status as a former public assistance recipient.”
Section 136 (1) provides that “[t]he names or addresses of persons applying for or receiving public assistance and care shall not be included in any published report or printed in any newspaper”. Its purpose is obvious: “to save recipients [of pub- *878 lie welfare] from embarrassment.” (Doe v Greco, 89 Misc 2d 187, 189 [Sup Ct, Ulster County 1976], affd 62 AD2d 498 [3d Dept 1978].) This confidentiality requirement reflected not only State concerns, but was mandated by Federal law which required such confidentiality in order for the State to be eligible to receive Federal funds for its social welfare programs.[7] Although section 136 (1) originally did not contain an express provision either allowing news organizations to inspect public welfare records or an express prohibition against such disclosure, Governor Nelson A. Rockefeller, in approving the 1960 amendment, believed that such disclosure to a newspaper was authorized by the language of the existing statute.[8] Thereafter, by the express terms of the 1960 amendment, an authorized representative of a bona fide news disseminating organization was permitted to inspect the “books and records of the disbursements,” and the amendment further provided that the news organization “shall be considered entitled to the information contained in such books and records”. (Emphasis added.) It was expressly required that the news organization provide written assurances against publicly disclosing “names and addresses of applicants for and recipients of public assistance *879 and care”. The 1960 amendment made disclosure of such information by a news organization punishable as a misdemeanor.[9]
There is no specific reference in the legislative history to any particular incident which spawned this amendment. However, according to the respondents, it “was born of a scandal in 1958 involving financial discrepancies in the records of the welfare rolls which did cast all kinds of doubts on how public assistance was being governed in New York State.” It appears from the Bill Jacket that this amendment was originally proposed by the New York State Society of Newspaper Editors and was “in keeping with the concept that the people have a right to know how their money is being spent” (letter dated Mar. 23, 1960 from Mason C. Taylor, Chairman, Welfare Amendment Comm, NYS Society of Newspaper Editors, Bill Jacket, L 1960, ch 1031). After approval by the State Board of Social Welfare and the Department of Social Welfare, the amendment was submitted by Assemblyman William J. Butler, Chairman, Social Welfare and Rélief Committee, who noted that the Society’s purpose was “merely to inspect the books and records of a public welfare agency to make sure that no irregularities exist.” (Mem of Assemblyman Butler in support of L 1960, ch 1031, 1960 NY Legis Ann, at 273.) The Association of the Bar of the City of New York, in a memorandum recommending disapproval (for reasons not relevant here), referred to the “objectives of the bill” and stated: ‘We understand that, in certain sections of the State, problems have arisen in the administration of the public assistance program (in particular, improprieties in the area of reimbursement for medical expenses), and that newspapers have been denied access to the facts on the ground that the statute barred disclosure.” (Mem of Comm on State Legislation, Bill Jacket, L 1960, ch 1031.) Finally, in his approval memorandum, in addition to the comments referred to above (n 8), Governor Rockefeller wrote that the bill “may also serve the useful purpose of developing a better citizen understanding of our public welfare program by the dissemination of information taken first hand from original and reliable sources.” (Governor’s Mem, op. cit., 1960 McKinney’s Session Laws of NY, at 2061.)
Analytically, section 136 (1) is a confidentiality statute. It begins with a clear statement proscribing the inclusion of “[t]he *880 names or addresses” of public assistance recipients “in any published report or printed in any newspaper or reported at any public meeting” except when necessary for the municipal authorities “to determine its budgetary needs.” (Doe v Greco, 62 AD2d, supra, at 501.) Next, the section proscribes disclosure of “such names and addresses and the amount received by or expended for such persons” to various municipal boards, agencies, officials, or their “authorized representative” except when “required [to] discharge its or his duties”. Disclosure is similarly permitted “to a person or agency considered entitled to have such information.”[10] Structurally, the statute then contains the text of the 1960 amendment, permitting a news organization to have “an authorized representative” inspect the “books and records of the disbursements made * * * for public assistance and care”. In such event, the news organization “shall be considered entitled to the information contained in such books and records,” upon providing written assurances that “it will not publicly disclose, or participate or acquiesce in the public disclosure of, the names and addresses”.
Confidentiality of the names and addresses of recipients of public assistance from unauthorized third persons certainly is the central theme of section 136. Its purpose is to protect the privacy of such recipients by restricting disclosure of their names and addresses only as provided in the statute. As seen, these statutory exceptions are narrowly drawn. And there is an express authorization permitting disclosure of such information to a news organization.
The exception, applicable to a news organization, permits an authorized representative to inspect the “books and records of the disbursements * * * for public assistance and care,” and the “organization shall be considered entitled to the information contained in such books and records.” (Social Services Law § 136 [1].) However, the statute does not define the “information” to which the news organization is deemed entitled. Respondents urge that coding the computerized records, in order to redact names and addresses, will satisfy the statute. This presupposes that the names and addresses are merely incidental to an authorized inspection of the “books and records of the disbursements”. If this is so, then, unlike 1960 when the records were handwritten ledgers, the City can generate redacted lists of disbursements, which would permit the *881 Times to correlate and examine the records without “identification” of individuals. Thus, a threshold question is whether names and addresses are encompassed in the term “information”, as used in section 136 (1).
It is, of course, a fundamental rule of statutory construction that a statute should be read “as a whole”. (E.g., Matter of Allstate Ins. Co. v Shaw, 52 NY2d 818, 820 [1980].) Looking at the entire statute shows that the opening words of the first clause prohibit disclosure of “[t]he names or addresses”, which ban is continued in the next clause. In the second sentence, which was added by the 1960 amendment, immediately after declaring that a news organization is “entitled to the information contained in such books and records [of the disbursements]”, there is the requirement of written assurances against disclosure of “the names and addresses”. The third sentence, also part of the 1960 amendment, criminalizes public disclosure of “the names and addresses”. It is evident from this analysis of the statute’s whole language, that the Legislature understood that the “books and records of the disbursements” would contain names and addresses, and that the “information” to which the news organization was to be “entitled” would include such names and addresses. To put it differently, a straightforward reading shows that the language of the statute itself “foresees that the [inspection] of records of disbursement might reveal names” and addresses, and prohibits their public disclosure. (See, Michigan Welfare Rights Org. v Dempsey, 462 F Supp 227, 235 [ED Mich 1978] [emphasis in original].)
Confirming this conclusion, that the information to which the news organization is entitled includes “names and addresses”, is Governor Rockefeller’s approval memorandum, in which he wrote that the “bill specifically permits newspapers * * * to have access to public welfare records provided they give written assurance that the names and addresses of such applicants and recipients are not disclosed * * * These safeguards are designed to assure that the personal rights of recipients and applicants are protected.” (Governor’s Mem, op. cit., 1960 McKinney’s Session Laws of NY, at 2061.) There would be no need for the Governor to have underscored the bill’s prohibition unless it was understood that in the course of inspection, the news organization would have access to names and addresses. It is also instructive that the regulations of the Department of Social Services (predecessor to the State intervenor) provide that the requisite “written assurance * * * that the names and addresses of applicants and recipients of *882 assistance shall not be published, shall be obtained * * * before allowing examination of records of disbursements”. (18 NYCRR 357.3 [g] [“Disclosure to bona fide news disseminating firm”] [emphasis added].) This regulation demonstrates the Department’s similar understanding that “names and addresses” are an integral part of the books and records of disbursements. From this analysis of the statutory language, taken in its entirety, I conclude that the “information” to which the requesting news organization is statutorily “entitled” includes the names and addresses which are contained in the “books and records of the disbursements”.
Having concluded that names and addresses may not be excluded from the records as to which inspection is permitted, the next question is whether the Times’ purpose in seeking inspection, and the use to which it wishes to put the information obtained, may be considered. If the news organization states that it intends to use the information in such a way which would violate the statute, it seems obvious that the inspection should not be required. To conclude otherwise would be ludicrous, since it would be to judicially countenance an illegality. Thus, under the circumstances here, where the City contends that the statute will be violated, it seems appropriate for me to reach this issue, recognizing that any decision in the context of an article 78 proceeding may or may not be determinative of a subsequent criminal action. It is also necessary to consider the City’s contention that the Legislature only intended a news organization to have access to these records for the specific purpose of informing the public about irregularities in disbursements, and therefore the Times is not entitled to inspect these records, or at the very least not entitled to inspect the records without the redaction of the names and addresses. With regard to this last argument, it is obviously impacted by my conclusion that the information to which a news organization is entitled, includes the names and addresses.
It cannot be prohibited public disclosure for the “authorized representative” of the news organization to communicate with other employees, including reporters, of the news organization and to disclose to such individuals the information which was properly obtained during the inspection. Any other interpretation would mean that the news organization could send an “authorized representative” to inspect the books and records, but that the news organization would not be able to utilize the information obtained. This, to me, is an irrational reading of the *883 statute. Thus, the only rational reading of the statutory prohibition is that it was designed to prevent disclosure beyond the very news organization which has lawfully obtained the information.
The next question is whether the news organization, acting through its own employees, can use the information obtained to contact and interview a past or present public assistance recipient, or whether this would be prohibited public disclosure. It seems to me, that in order to answer this question, it is necessary to examine the common meanings of the terms “publicly disclose” and “public disclosure”, since the statutory prohibition is that the news organization “will not publicly disclose, or participate or acquiesce in the public disclosure of, the names and addresses” (Social Services Law § 136 [1] [emphasis added]). If these terms are clear and unambiguous, it is fundamental that effect must be given to their plain meaning. (E.g., Patrolmen’s Benevolent Assn. v City of New York, 41 NY2d 205, 208 [1976].) “Disclose” means to “open up”, “to make known: open up to general knowledge * * * esp: to reveal in words (something that is secret or not generally known): divulge” (Webster’s Third New International Dictionary 645 [unabridged ed 1961]); and “disclosure” means “the act or instance of disclosing” (Random House Dictionary of English Language 461 [unabridged ed 1966]). “Public” means “of or pertaining to, or affecting the People as a whole or the community, state or nation’s public funds”; “open to the view or knowledge of all * * * the fact became public” (id., at 1162), or “of, relating to, or affecting the people as an organized community” (Webster’s, op. cit., at 1836; see also, Black’s Law Dictionary 464, 1227 [6th ed 1990]). The plain meaning of the statutory wording then is to prohibit making the names and addresses of recipients of public assistance, which were previously unknown, known to members of the community.
It flows from this unambiguous meaning that since the recipient is certainly aware of his or her receipt of public assistance, revelation or divulgence of unknown information would not occur by the act of contacting and seeking to interview these persons. Thus, the action in doing so would not be to “disclose” nor would there be any “disclosure” of the names and addresses. Moreover, contact with the recipients would not be “public” since it would not involve other persons, but only the recipient, himself or herself. Consequently, there would not be the prohibited “public disclosure” in contacting or interviewing the recipients.
The concluding inquiry is whether the legislative history requires that section 136 (1) must be read to limit the autho *884 rized inspection to an examination of the records only for financial irregularities. Notably, the statute itself does not contain any such restriction.
Turning to the legislative history, which has already been somewhat discussed, it certainly contains references to “irregularities”, although what kind is not specified (Mem of Assemblyman Butler, op. cit.) and to “improprieties” (in medical reimbursements) (Disapproval Mem of Assn of Bar of City of NY, Bill Jacket, L 1960, ch 1031).[11] However, there are other references to a broader purpose. Not only did Governor Rockefeller write that the amendment was designed to “better citizen understanding” of the State’s public welfare program, a wider purpose than financial irregularities or improprieties, but he quoted at length from the letter from the State Charities Aid Association recommending approval of the amendment, where the Association’s Executive Director stated that “ ‘[a] public welfare program can be effective, in the long run only if it earns the trust of the citizens whose tax money is being spent. Thus, the citizens must be well informed on public welfare facts.’ ” (Governor’s Mem, op. cit., 1960 McKinney’s Session Laws of NY, at 2061.) Other references further demonstrate that the amendment’s purpose was not exclusively financial dereliction. For example, Roger H. Butts, Chairman, Legislative Committee of the New York Public Welfare Association, stated that the amendment “is in the interest of good public relations to make information available to bonafide news disseminating organizations [subject to the confidentiality provisions]” (letter dated Mar. 28, 1960, Bill Jacket, L 1960, ch 1031), and C.L. Chamberlain, Executive Director, County Officers Association, State of New York, wrote that the amendment relates “to disseminating public information as to the cost of social welfare” (letter dated Apr. 20, 1960, Bill Jacket, L 1960, ch 1031).
*885 It appears, therefore, that the purpose or intention of the Legislature in enacting the 1960 amendment was to allow news organizations access to the information contained in “books and records of the disbursements”, subject to the disclosure prohibition, not only to search financial irregularities, improprieties, or fraud, but to promote improved or “better” public understanding of New York’s “welfare program.” This being so, there is no principled basis to construe section 136 (1) in the manner urged by the respondents. Thus, even though the Times admittedly is not seeking to uncover financial irregularities, but rather has a different purpose, this does not require denial of its demand for inspection of the “books and records of the disbursements”.
Whether embarrassment would be caused to the recipient, as argued and as may likely occur, does not determine the proper construction of the statutory language. The Legislature could have prohibited not only “public disclosure” or the act of “publicly disclosing]” the names and addresses, as it did, but also prohibited any use of the information to contact or interview a recipient of public assistance. It did not do so, as it did not provide that the books and records may only be inspected for financial improprieties, irregularities, or fraud. There is nothing in the legislative history, or the language of the statute, to warrant reading “such * * * categorical limitation [s] into the statute”. (Matter of Gould v New York City Police Dept., 89 NY2d 267, 274 [1996] .)[12]
Finally, it is argued that the interpretation of section 136 by the New York State Office of Temporary and Disability Assistance, the agency responsible for the administration of public assistance programs, should be “given great weight and judicial deference.” Certainly, if the “interpretation or application of a statute involves an understanding of underlying operational *886 practices or the evaluation of factual data * * * the courts regularly defer to the agency charged with the responsibility for administration of that statute.” (See generally, 97 NY Jur 2d, Statutes, § 159, at 121 [1992].) However, as stated by the Court of Appeals, “[w]hen the interpretation of a statute is one of ‘pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency’ and the legal interpretation is ultimately the court’s responsibility”. (Matter of Drew v Schenectady County, 88 NY2d 242, 246 [1996].) This is the case with section 136 (1), which does not require prior State approval of requests by news organizations to inspect the books and records of disbursements, nor does it require the promulgation of State regulations implementing the processing of such requests. Moreover, there is nothing specialized in its language that necessitates deference to the State agency’s reading of the statute. Rather, section 136 (1) contains “[w]ords of ordinary import [which] are to be given their usual and commonly understood meaning, unless it is clear from the statutory language that a different meaning was intended”. (We’re Assocs. Co. v Cohen, Stracher & Bloom, 65 NY2d 148, 151 [1985], quoted in Matter of Drew v Schenectady County, supra, at 246.) Since the meaning is determinable from the plain language of the statute itself, this is not a matter involving an agency’s expertise.
It is incontrovertible that the 1960 amendment crafted a particularized exception to the confidentiality which surrounds public assistance records. This exception permitted an authorized representative of a news organization to inspect the records. The news organization is statutorily entitled to the information contained in the records. However, the public welfare officials are not required to provide the authorized representative with a list of names and addresses of past and present recipients of public assistance. What the public welfare officials are required to do is to permit the requested inspection of the books and records of disbursements, and they may not withhold the names and addresses. That is all that is statutorily required.
Accordingly, for the foregoing reasons, the petition is granted, and the Times may inspect the books and records of disbursements, as requested under section 136 (1) of the Social Services Law.

. The New York State Office of Temporary and Disability Assistance (successor to the Department of Social Services) was allowed to intervene by permission (CPLR 1013).

. Section 136 (1), entitled “Protection of public welfare records”, reads as follows: “The names or addresses of persons applying for or receiving public assistance and care shall not be included in any published report or printed in any newspaper or reported at any public meeting except meetings of the county board of supervisors, city council, town board or other board or body authorized and required to appropriate funds for public assistance and care in and for such county, city or town; nor shall such names and addresses and the amount received by or expended for such persons be disclosed except to the commissioner of social services or his authorized representative, such county, city or town board or body or its authorized representative, any other body or official required to have such information properly to discharge its or his duties, or, by authority of such county, city or town appropriating board or body or of the social services official of the county, city or town, to a person or agency considered entitled to such information. However, if a bona fide news disseminating firm or organization makes a written request to the social services official or the appropriating board or body of a county, city or town to allow inspection by an authorized representative of such firm or organization of the books and records of the disbursements made by such county, city or town for public assistance and care, such requests shall be granted within five days and such firm or organization shall be considered entitled to the information contained in such books and records, provided such firm or organization shall give assurances in writing that it will not publicly disclose, or participate or acquiesce in the public disclosure of, the names and addresses of applicants for and recipients of public assistance and care except as expressly permitted by subdivision four. If such firm or organization shall, after giving such assurance, publicly disclose, or participate or acquiesce in the public disclosure of, the names and addresses of applicants for or recipients of public assistance and care except as expressly permitted by subdivision four, then such firm or organization shall be deemed to have violated this section and such violation shall constitute a misdemeanor. As used herein a news disseminating firm or organization shall mean and include: a newspaper; a newspaper service association or agency; a magazine; a radio or television station or system; a motion picture news agency.”

. Since there is no issue as to whether the Times falls within the purview of this statute, there is no need to discuss the City’s concern over the reach of this section and whether it would include, for example, newsletter or internet publishers.

. Acknowledging the immense numbers involved, counsel for the Times stated: “A representative sample is something we’d be happy to discuss with the City, but we certainly never got that far because we disagree as a matter of principle whether there could be any access to any names and addresses.”

. In a subsequent letter, Paul A. Grotty, Esq., Corporation Counsel, wrote to the Times as follows: *876 “Social Services Law § 136, entitled ‘Protection of Public Welfare Records,’ prohibits disclosure of the names and addresses of persons applying for or receiving public assistance. Newspapers may have access, however, to the books and records of disbursements for public assistance. Accordingly, the request, insofar as it seeks books and records reflecting HRA’s disbursements for public assistance, is granted. As Gabriel Gorenstein, counsel to HRA, made clear in his letter of July 30,1997, HRA is willing to provide the Times with access to its books and records reflecting such disbursements.
“Your draft verified petition, however, makes clear that the New York Times seeks access to public assistance files unconnected with any inquiry into disbursements. Social Services Law § 136 is intended to protect public assistance recipients from invasion of their privacy; and the confidentiality provision set forth in that section contains no exception for access by news organizations to information in the manner that the Times seeks it.
‘We are prepared to work with the New York Times to expedite a review of HRA’s disbursement records for public assistance, as contemplated by Social Services Law § 136.”

. This is a reference to a letter supporting the amendment, from Gordon E. Brown, Executive Director of the State Charities Aid Association, who wrote: “We recognize, of course, that an individual whose identity was disclosed from inspection of records might later be contacted or interviewed, and that the consequence of permitting such inspection would be to this extent, a violation of personal privacy. It should be noted however, that there are other ways that a reporter could obtain such a lead, and therefore this possibility of follow-up interviews does not, in and of itself, seem a reasonable basis for opposing this measure.” (Bill Jacket, L 1960, ch 1031, letter dated Mar. 28, 1960.)

. Congress conditioned the receipt of Federal funds to finance public assistance programs by requiring that the receiving State “provide safeguards which restrict the use or disclosure of information concerning applicants or recipients” (42 USC § 602 [a] [9], repealed eff July 1, 1997 [Aid to Families with Dependent Children]). Current Federal law requires the State to submit a plan that includes “reasonable steps as the State deems necessary to restrict the use and disclosure of information about individuals and families receiving assistance”. (42 USC § 602 [a] [1] [A] [iv], eff July 1, 1997.)
In 1951, Congress added 42 USC § 1306a, which provides that a State may not be deprived of Federal funds because of State legislation permitting public access to “records of the disbursement”, so long as the “legislation prohibits the use of any list or names obtained * * * for commercial or political purposes.” Section 136 (4) contains this prohibition.

. Governor Rockefeller wrote that the amendment “will * * * clarify the original intent of the Legislature in 1953” (Governor’s Mem approving L 1960, ch 1031, 1960 McKinney’s Session Laws of NY, at 2061) when it added to the statute a provision authorizing disclosure of names and addresses to certain public officials and “to a person or agency considered entitled to such information [§ 136 (1)].” He further wrote: “[t]hat [1953] amendment marked a step in the direction of disclosure of these records and by its terms appeared to allow disclosure to newspapers. However, in at least two counties, officials have interpreted the law to mean that a newspaper was not entitled to have this information.” (Ibid.) By this it appears that, at least as far as the Governor was concerned, the 1960 amendment was unexceptional and served to clear up what was considered to be a misinterpretation of existing law.

. An exception to this prohibition against public disclosure by a news organization was expressly created to cover the situation when an applicant for, or recipient of, public assistance is charged with a crime relating to the application or receipt of such assistance. (Social Services Law § 136 [4].)

. This portion of the statute has been construed to prevent disclosure to an individual member of a county board of supervisors. (1962 Opns Atty Gen 295.)

. In recommending disapproval of the amendment, the Committee on Public Affairs of the Community Service Society of New York stated: “If discovery of possible fraud is the aim of this measure, then it is surely an unsound one. Newspapers and other news media are not the proper law enforcement authorities in any community.” (Mem dated Mar. 15, 1960, Bill Jacket, L 1960, ch 1031.) Mrs. George L. Govern, Chairman, State Committee on Children and Public Welfare of the State Charities Aid Association, wrote: “We are well aware that there is much concern over welfare expenditures and possible fraud. Our Committee and its county-wide components have therefore worked for many years to promote well-administered public welfare services and to interpret welfare programs to the public. We doubt that this is a job to be handled by news disseminating firms” (letter dated Mar. 18, 1960, Bill Jacket, L 1960, ch 1031).

. As quoted in footnote 6, the Executive Director of the State Charities Aid Association, in support of the amendment, wrote to Governor Rockfeller and pointed out that contact or interview of a public assistance recipient by a reporter was a foreseeable consequence. This communication, which demonstrates that this concern was not unknown to the Legislature at the time of the amendment, while certainly not conclusive in itself, is an aid (cf., De Ville v Continental Assur. Co., 10 AD2d 386, 390, affd 8 NY2d 1080 [1960]) in reaching the conclusion not to read into the statute restrictions which the Legislature did not include, however compelling. This would not be statutory interpretation, but rather as stated by the Court of Appeals in a differing context: “dealing with a legislative omission that should not be supplied by” the courts (Matter of Consolidated Mut. Ins. Co., 60 NY2d 1, 12 [1983]; see also, Matter of Smith [Great Am. Ins. Co.], 29 NY2d 116, 120 [1971]; Matter of McNerney v City of Geneva, 290 NY 505, 511 [1943]).